United States District Court
Southern District of Texas
**ENTERED**
September 15, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KENNETH L. SCHROEDER, | § | |
| TDCJ #01813989, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 3:15-CV-109 |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

The petitioner, Kenneth Schroeder (TDCJ #01813989), is a state inmate incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). Schroeder has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging a state court conviction. Respondent Lorie Davis has filed a motion for summary judgment accompanied by the appropriate state-court records (Dkt. 24–Dkt. 27). Schroeder has responded (Dkt. 35).

After reviewing all of the pleadings, the record, and the applicable law, the Court concludes that the Respondent is entitled to summary judgment.

## I.    BACKGROUND

On April 25, 2012, a Galveston County jury convicted Schroeder of one count of driving while intoxicated, finding that he drove a car while impaired by prescription medication. *See* TEX. PENAL CODE §§ 49.01(2)(A), 49.04; Galveston County Criminal Case Number 10CR2872. Schroeder conceded to the jury that he had prescription drugs

in his bloodstream when he was arrested but argued that those drugs were present at concentrations within or below their respective therapeutic ranges and that any impairment was the result of dehydration. Prior convictions elevated the DWI charge to a felony, and prior felony convictions elevated the punishment range to a minimum of 25 years and a maximum of 99. *See* TEX. PENAL CODE §§ 12.42(d), 49.09(b)(2). Schroeder received the minimum.

At trial, the State introduced evidence, including a video, showing that a Texas state trooper pulled Schroeder over on September 18, 2010 for going 67 miles per hour in a 55-mile-per-hour zone (Dkt. 24-17 at pp. 12–15). The trooper testified that Schroeder, when approached, "gave [the trooper] kind of a blank stare" with "red, glassy eyes" (Dkt. 24-17 at p. 15). Suspecting intoxication, the trooper ordered Schroeder to exit his car and meet the trooper in front of the police cruiser (Dkt. 24-17 at p. 16). Schroeder got out of his car and walked over to the trooper, who asked Schroeder about his activities immediately prior to the traffic stop. The trooper's testimony and the video, which the Court has viewed, established that Schroeder noticeably slurred his words and took a remarkably long time to answer even simple questions (Dkt. 24-17 at pp. 16–17; Dkt. 27). For instance, Schroeder spent 25 seconds trying to remember where he had just been; when he finally recalled the name of the establishment (Legends), he spent another 20 seconds trying to remember what kind of place it was (a pool hall) and could only do so with a prompt from the trooper. Schroeder also told the trooper that he had taken prescription medication earlier, but it took him another long delay to remember that the medication was a muscle relaxer. When Schroeder subsequently performed poorly on a

battery of field sobriety tests, the trooper placed him under arrest and took him to Mainland Medical Center to have a blood specimen drawn (Dkt. 24-17 at pp. 16–29).

Analysis of the blood sample revealed that Schroeder's blood was free of alcohol but contained hydrocodone, a painkiller, in a concentration of .03 milligrams per liter; carisoprodol, a muscle relaxer, at 8.5 milligrams per liter; and meprobamate, a metabolite of carisoprodol, at 26 milligrams per liter (Dkt. 24-17 at p. 96–97). A forensic scientist for the State testified that, according to National Highway Traffic Safety Administration ("NHTSA") literature, the carisoprodol level was 70 percent higher than the top end of the therapeutic range, with "therapeutic range" described as "the concentration that would be found in your blood had you been taking it as it is generally prescribed" (Dkt. 24-17 at pp. 97–99). According to that literature, the carisoprodol level was the only level that was outside its therapeutic range; the hydrocodone and meprobamate levels were within theirs (Dkt. 24-17 at pp. 97–99). However, the State's scientist emphasized that "it's been shown in studies that these and even lower levels of carisoprodol and meprobamate together can cause impairment" (Dkt. 24-17 at pp. 97–99). The scientist further stated that the NHTSA literature indicated that the concentrations and combination of drugs found in Schroeder's blood would affect the normal use of mental and physical faculties (Dkt. 24-17 at pp. 97–99, 105). A pharmacy record admitted into evidence showed that Schroeder had repeatedly refilled prescriptions for hydrocodone and carisoprodol over a period of years before his arrest (Dkt. 24-20 at pp. 17–18).

Schroeder countered with his own experts, a pharmacist and a licensed master peace officer, as well as evidence that he was treated for dehydration after being involved

in a car wreck two months before his arrest. The pharmacist testified that the amount of carisoprodol in Schroeder's bloodstream was actually below the therapeutic range, not above it, because the State's expert did not apply the proper range (Dkt. 24-18 at pp. 20, 27–29). The pharmacist added that a concentration within the therapeutic range indicated that a medication "was probably being used within the doctor's order" but made clear that a concentration above the therapeutic range would not necessarily signal ingestion in excess of the prescribed dosage because "everyone metabolizes medication differently" (Dkt. 24-18 at p. 33). The pharmacist also testified that several medical conditions, including dehydration, can cause a person to appear intoxicated (Dkt. 24-18 at pp. 24). The master peace officer echoed the pharmacist's statement that dehydration, among other conditions, can cause a person to appear intoxicated and added that those conditions can cause poor performance on field sobriety tests (Dkt. 24-18 at pp. 43–44). Schroeder also offered medical records into evidence showing that, two months prior to his arrest, he was taken to the emergency room and treated for dehydration after rear-ending a recreational vehicle (Dkt. 25-2). In that instance, the dehydration evidently made Schroeder display symptoms consistent with intoxication; an officer at the scene of the wreck attempted to secure a blood sample, but the paramedics did not have the requisite training or equipment to draw blood for a DWI investigation (Dkt. 25-2 at p. 11).

After the jury found him guilty, Schroeder appealed, arguing that the evidence was insufficient to sustain his conviction and that his trial counsel had provided ineffective assistance. The Fourteenth Court of Appeals of Texas remanded the matter to the trial court so that Schroeder could file a motion for new trial and develop a more extensive

record on the ineffective-assistance issue. The trial court held a hearing at which testimony was given by five witnesses: Schroeder; Schroeder's trial counsel; Schroeder's pharmacist expert; another pharmacist who was mentioned as a potential expert witness but never called by Schroeder's trial counsel; and a lifelong friend of Schroeder's who held power of attorney for him (Dkt. 25-4). After the hearing, the trial court denied Schroeder's motion for new trial. Schroeder then returned to the Fourteenth Court, which affirmed his conviction. *See Schroeder v. State*, No. 14-12-00523-CR, 2014 WL 129312 (Tex. App.—Houston [14th Dist.] Jan. 14, 2014, pet. ref'd). The Texas Court of Criminal Appeals denied discretionary review. *See* Texas Court of Criminal Appeals Case Number PD-0145-14. Schroeder pursued collateral review by filing a state habeas petition, which the Texas Court of Criminal Appeals denied without opinion. *See* Texas Court of Criminal Appeals Case Number WR-68,677-02.

Schroeder then filed this federal habeas petition. As he did on direct appeal, Schroeder argues that his conviction was supported by insufficient evidence and that his trial counsel provided ineffective assistance (Dkt. 1 at p. 6).

## II.    STANDARDS OF REVIEW

### A.    Habeas Corpus

Schroeder's federal habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Lindh v. Murphy*, 117 S. Ct. 2059, 2068 (1997). The intent of the AEDPA is to avoid federal habeas "retrials" and "ensure that state-court convictions are given effect to the extent possible under [the] law." *Bell v. Cone*, 122 S. Ct. 1843, 1849 (2002).

The provisions of Section 2254(d) create a highly deferential standard, thereby demanding that state court decisions be given the benefit of the doubt. *Woodford v. Visciotti*, 123 S. Ct. 357, 360 (2002). A federal court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's decision:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

"Pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), and questions of fact are reviewed under § 2254(d)(2)." *Martin v. Cain*, 246 F.3d 471, 475–76 (5th Cir. 2001) (quotation marks omitted).

A state court decision is contrary to clearly established law if the decision contradicts the governing law set forth by the Supreme Court or if the state court decides a case differently than the Court's precedent when the facts are materially indistinguishable. *Early v. Packard*, 123 S. Ct. 362, 365 (2002). A state court unreasonably applies federal law if the court "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). To be an unreasonable application of federal law, the state court decision must be objectively unreasonable and more than simply incorrect or erroneous. *Lockyer v. Andrade*, 123 S. Ct. 1166, 1174 (2003).

Because the AEDPA grants great deference to state determinations of factual issues, a claim adjudicated on its merits in state court and based on factual decisions will not be overturned on factual grounds unless the court determines that the decision was both incorrect and objectively unreasonable. *Williams*, 120 S. Ct. at 1522. In reviewing a federal habeas petition, the court must presume that a factual determination made by the state court is correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### B.    Summary Judgment

A court may grant summary judgment when the evidence shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986). The moving party has the responsibility of informing the court of the basis for its summary judgment motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . .'" that demonstrate that there is no genuine issue of material fact. *Celotex*, 106 S. Ct. at 2553. In response, the nonmovant must go beyond the pleadings and by affidavits, depositions, answers to interrogatories, or admissions on file show that there is a genuine issue of material fact requiring resolution through a trial. *Id*. If the nonmoving party is unable to meet this burden, the motion for summary judgment will be granted. FED. R. CIV. P. 56(c).

Rule 56 of the Federal Rules of Civil Procedure "applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).

The rule, however, only applies to the extent that it does not conflict with the habeas rules. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds*, *Tennard v. Dretke*, 124 S. Ct. 2562 (2004). Generally, in ruling on a motion for summary judgment, the court resolves any doubts and draws any inferences in favor of the nonmoving party—*Hunt v. Cromartie*, 119 S. Ct. 1545, 1551–52 (1999)—but 28 U.S.C. § 2254(e)(1) commands that factual findings of the state court are to be presumed correct. Thus, 28 U.S.C. § 2254(e)(1) overrides the general summary judgment rule. *Smith*, 311 F.3d at 668. The petitioner is required to rebut the presumption of correctness by clear and convincing evidence; otherwise, the court will presume the factual determination of the state court is correct. *Id*.; 28 U.S.C. § 2254(e)(1).

### III.   <u>SUFFICIENCY OF THE EVIDENCE</u>

Schroeder first challenges the sufficiency of the evidence used to convict him. In order to obtain habeas relief on this ground, Schroeder must show that, "upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). The evidence is viewed in the light most favorable to the prosecution. *Id.* at 319. The essential substantive elements of the criminal offense are established by the state's criminal law. *Id.* at 324 n.16; *Hughes v. Johnson*, 191 F.3d 607, 619 (5th Cir. 1999).

Schroeder was convicted under Section 49.04 of the Texas Penal Code. A person commits an offense under that statute when he or she "is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE § 49.04(a). "'Intoxicated' means . . . not having the normal use of mental or physical faculties by reason of the introduction of

alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body[.]" TEX. PENAL CODE § 49.01(2)(A). DWI is a strict-liability crime in Texas; the State does not have to prove a specific culpable mental state such as intent, recklessness, or knowledge. *Farmer v. State*, 411 S.W.3d 901, 905 (Tex. Crim. App. 2013).

Schroeder characterizes the evidence adduced to prove that he was driving while intoxicated as "fatally equivocal" and analogizes it to the evidence in *Redwine v. State*, 305 S.W.3d 360 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd), in which the Fourteenth Court reversed a conviction because the prosecution had presented only the equivocal, uncorroborated testimony of one witness to prove an essential element of a crime (Dkt. 1-1 at p. 5). *See Redwine*, 305 S.W.3d at 366–68 & n. 17. Convictions are occasionally reversed on such grounds; the element in question is typically identity. For instance, the Fifth Circuit has held that "[i]f . . . the sole witness is unsure [about the perpetrator's identity] and there are no other connecting or corroborating facts or circumstances the jury is left without evidence upon which to translate unrelieved uncertainty into belief from the evidence beyond a reasonable doubt." *United States v. Johnson*, 427 F.2d 957, 961 (5th Cir. 1970). Schroeder claims that his is such a case, arguing that:

> [t]he closest the State got to demonstrating that the Petitioner was impaired by reason of introduction of substances (prescription drugs) to his body, was the testimony of DPS Scientist Paris. As noted above, Ms. Paris stated nothing more definite than that the drugs could cause drowsiness or dizziness, lack of coordination or slurred speech and that the various drugs "can" cause impairment. Ms. Paris stopped well short of even stating that the drugs probably caused Petitioner's condition, let alone demonstrating

> actual cause beyond a reasonable doubt, but could only guess as to her accuracy.
> Dkt. 1-1 at p. 5 (record citations omitted).

In *Redwine*, the defendant was convicted of evading arrest using a vehicle. The essential element on which the State's proof was deficient was the defendant's knowledge that police officers were attempting to arrest or detain him while he was driving his truck. *Redwine*, 305 S.W.3d at 368. There was no direct evidence of such knowledge. The State could have shown knowledge circumstantially by establishing that the officers had turned on their cruiser's overhead lights while they were following the defendant; but one of the officers could not remember whether the lights were on, and the other unequivocally testified that the lights were off. *Id*. at 364–65. There was no video of the incident. *Id*. The officers' report did not mention the emergency lights. *Id*. The prosecution even candidly admitted in its closing argument that the lights were never turned on because the officers did not want to alert the defendant to their presence. *Id*. Schroeder seems to be drawing a parallel between the State's scientific testimony in his case and the testimony of the *Redwine* officer who could not remember whether the cruiser's lights were on.

The analogy is false. The State's scientific testimony in Schroeder's trial was bolstered by, and bolstered, abundant other evidence offered by the State. There is no question that Schroeder took prescription drugs on the night on which he was arrested (he told the trooper that he had taken two Somas—Soma is a brand name for carisoprodol—in the video). There is no question that drugs were found in a sample of his blood taken immediately after his arrest. There is no question as to which drugs were found in that

sample, or in what amounts. The trooper's testimony and the video of the traffic stop provided compelling evidence that Schroeder was operating a motor vehicle in a public place without the normal use of his mental or physical faculties; even Schroeder had to admit at his motion-for-new-trial hearing that, when he saw the video, he "didn't think it looked very good" (Dkt. 25-4 at p. 77). The State's scientific testimony established that medical and scientific literature linked the concentrations and combination of drugs found in Schroeder's bloodstream to the loss of the normal use of mental and physical faculties. Together, these basic facts would allow a rational factfinder to draw the reasonable inference that Schroeder operated a motor vehicle in a public place while not having the normal use of his mental or physical faculties by reason of the introduction of prescription medications into his body. The drawing of such inferences is not only within the jury's power but part of the jury's responsibility. *Jackson*, 443 U.S. at 319.

At bottom, Schroeder seems to think that the State's evidence was "equivocal," and therefore insufficient, because the State's forensic scientist did not specifically address dehydration, which was Schroeder's explanation for his impairment. But the prosecution is not "under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt[,]" and the evidence of guilt is not insufficient simply because the record might support conflicting inferences. *Id*. at 319, 326. In fact, the resolution of conflicting inferences and hypotheses is perhaps the factfinder's most important role, and one that *Jackson* took great pains to preserve. *See id*. ("This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts."). The state courts' adjudication of Schroeder's sufficiency-of-the-evidence claim did not result in a decision that was contrary to, or involved an unreasonable application of, the Supreme Court's decision in *Jackson*.

## IV.    INEFFECTIVENESS OF TRIAL COUNSEL

Schroeder's argument that his trial counsel was ineffective is summarized on page 6 of his petition:

> Petitioner received ineffective assistance from his retained counsel, who clearly used this case to benefit himself financially rather than help his client or present a viable defense. For reasons of financial benefit, trial counsel misadvised Appellant [sic] as to the merits of his defense, and misplaced funds which were specifically paid and earmarked to employ an expert. Trial Counsel did not even interview or consult with a Pharmacologist, but instead selected a pharmacist client who was not paid, who was not qualified, and who was ill-prepared. The testimony of that pharmacist actually harmed Petitioner, and served no purpose at the time of trial other than to buttress the State's case and to lend some credence to the Trial Counsel's false claim to his client that $9,500.00 had actually been spent on an expert.
> Dkt. 1 at p. 6.

Even though Schroeder devotes several pages of his briefing to detailing alleged financial chicanery on the part of his counsel, what his claims really boil down to is the allegation that his counsel allowed self-interest to affect his trial strategy. An argument that trial counsel had a conflict of interest can be governed by either *Strickland v. Washington*, 466 U.S. 668 (1984), or *Cuyler v. Sullivan*, 446 U.S. 335 (1980), depending on the nature of the alleged conflict. The Fifth Circuit has limited the reach of *Cuyler* to cases in which an alleged attorney conflict resulted from serial representation or simultaneous multiple representation of criminal defendants, reasoning that "*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or

serial client context." *Beets v. Scott*, 65 F.3d 1258, 1265–66 & n.8 (5th Cir. 1995) (en banc), *cert. denied*, 517 U.S. 1252 (1996); *see also Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir. 1997) ("This circuit has limited *Cuyler* to actual conflicts resulting from a lawyer's representation of multiple criminal defendants."). "Under *Beets*, cases in which it is alleged that the attorney's representation was affected by his own self-interest are evaluated under the more relaxed *Strickland* standard." *Moreland v. Scott*, 175 F.3d 347, 349 (5th Cir. 1999).

In order to prevail under *Strickland*, a criminal defendant must show that counsel failed to act reasonably considering all the circumstances and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment; and the defendant cannot meet the "reasonable probability" standard without showing a substantial, as opposed to conceivable, likelihood of a different result. *Id*. Review of *Strickland* claims on federal habeas is "doubly deferential" because the *Strickland* standard is applied in tandem with the approach commanded by 28 U.S.C. § 2254(d). *Id*. As the Supreme Court puts it, this Court must therefore "take a highly deferential look at counsel's performance through the deferential lens of 2254(d)." *Id*. (quotation marks and citations omitted). The prejudice prong of the *Strickland* test may be addressed before the performance prong, as the absence of either prong is dispositive. *Strickland*, 466 U.S. at 697.

**A.      Calling the pharmacist and not calling a pharmacologist**

Schroeder first argues that his trial counsel should have consulted and called a pharmacologist instead of a pharmacist as an expert witness. There appear to be two distinct, though related, claims: a claim that counsel should have consulted and called a pharmacologist and a claim that counsel should *not* have called the particular pharmacist that he called. According to Schroeder, the pharmacist his trial counsel called was unqualified and ill-prepared and did more harm than good; a pharmacologist, Schroeder argues, could have more effectively rebutted the State's scientific testimony (Dkt. 35 at p. 2). At the hearing on Schroeder's motion for new trial, Schroeder's trial counsel testified that he "did not speak with any pharmacologist about this case as [he] didn't see it would add anything to the defense" (Dkt. 25-4 at p. 46). Counsel elaborated by saying that:

> [t]here was no question that there were drugs in Mr. Schroeder's system. There's no question as to the amount of the drugs. The only question was the physiological effect on the human body; and I thought a pharmacist who's been in practice for years and years would be able to describe that quite well, and I believe that occurred.
> Dkt. 25-4 at p. 46.

Schroeder's claim that his counsel was ineffective for not calling a pharmacologist at trial fails. In the Fifth Circuit, "to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). The Fifth

Circuit "require[s] this showing for claims regarding uncalled lay and expert witnesses alike." *Id.* Schroeder has not provided any evidence on any of the required points, so the Court has "no evidence beyond speculation" that Schroeder's counsel, at the time of trial, "could have found and presented an expert witness who would have testified as [Schroeder] claimed in his post-conviction applications." *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Similarly, Schroeder's claim that his counsel was ineffective for not consulting a pharmacologist (as opposed to calling one at trial) must fail because he has not "allege[d] with specificity what such an investigation would have revealed and how it could have altered the outcome of the trial." *United States v. Bernard*, 762 F.3d 467, 473 (5th Cir. 2014). His vague, unsupported allegations that consultations with a hypothetical pharmacologist could have provided insight into "residuals (the fact that drugs stay in the system for weeks)" and "resistance (the tolerance built up over time)" do not meet this burden (Dkt. 35 at p. 2).

Schroeder has also failed to satisfy the *Strickland* test with regard to his claim that his trial counsel was ineffective for calling the pharmacist. Schroeder's claim that the pharmacist torpedoed Schroeder's defense is based on two bits of testimony (Dkt. 1-1 at pp. 10–11). The first was the following exchange on direct examination:

| | |
|---|---|
| [Schroeder's counsel]: | Would you expect somebody to appear intoxicated on the levels that are shown in this blood test? |
| [Pharmacist]: | Not always. |

Dkt. 24-18 at p. 23.

The second was the following exchange on cross-examination:

| | |
|---|---|
| [Prosecutor]: | And are you familiar at all with certain cocktails that, you know, people who do come to your pharmacy who are drug seekers try to combine drugs together? Are you familiar at all with any cocktail mixtures? |
| [Pharmacist]: | Yes. |
| [Prosecutor]: | What are the most popular drug mixtures? |
| [Pharmacist]: | There is Soma, hydrocodone, Xanax. |
| [Prosecutor]: | And so people usually combine those together to get whatever type of effect they're trying to get? |
| [Pharmacist]: | Yeah, yeah. That's the ones we see from the pain clinics a lot of times. |

Dkt. 24-18 at p. 32.

The Court disagrees with Schroeder's argument that the quoted statements by the pharmacist are emblematic of unreasonable performance by trial counsel. The first exchange was consistent with the pharmacist's testimony that drug metabolism is not uniform. And the second exchange was not an admission that Schroeder himself was making drug cocktails—the pharmacist emphasized elsewhere in his testimony that the drug levels in Schroeder's bloodstream were consistent with his taking the drugs as prescribed. While testimony about Schroeder's compliance with his prescriptions might seem incidental given the lack of a *mens rea* requirement, that testimony lent credence to Schroeder's dehydration defense, especially coupled with evidence showing that Schroeder had recently been medically treated for dehydration after having displayed symptoms consistent with intoxication.

Calling the pharmacist was an informed strategic decision by Schroeder's counsel that is due a heavy measure of deference. Looking at the pharmacist's testimony as a whole, the statements that some drug addicts mix hydrocodone and Soma and that some people with blood test results equivalent to Schroeder's could appear intoxicated were not particularly damaging, assuming they were harmful at all. Those statements certainly do not render the decision to call the pharmacist unreasonable. *Cf. Raby v. Dretke*, 78 Fed. App'x 324, 328–29 (5th Cir. 2003) (holding that the first prong of *Strickland* was not met when a defense expert referred to the defendant during the punishment phase as a "psychopath" because other witnesses provided effective mitigation testimony and the attorney thought that the expert's testimony would help establish that the Texas prison system would contain any future dangerousness on the petitioner's part). In any event, Schroeder has not shown a substantial likelihood that he would have been acquitted had his counsel not called the pharmacist to testify. The State's evidence was sufficient to prove Schroeder's guilt beyond a reasonable doubt, and Schroeder would have had no defense without the testimony of the pharmacist.

### B.    The plea negotiations

Schroeder also claims that he turned down an eight-year plea offer from the State because his counsel, who was only interested in going to trial and collecting legal fees, advised him "not to agree to any plea bargain offered by the Prosecutor" (Dkt. 1 at p. 6; Dkt. 1-1 at pp. 7, 10). The *Strickland* standard extends to plea negotiations. When a criminal defendant argues that he rejected a plea offer and chose to stand trial based on ineffective assistance of counsel, he must show a reasonable probability that, but for

counsel's ineffective advice, he would have accepted the plea offer; the prosecution would not have withdrawn the offer in light of intervening circumstances; the court would have accepted the plea offer's terms; and the conviction or sentence (or both) under the plea offer would have been less severe than under the judgment and sentence that were in fact imposed. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384–85 (2012).

It is undisputed that Schroeder, instead of taking the eight-year offer, asked his counsel to counter it with a two-year offer, which the prosecution rejected (Dkt. 25-4 at pp. 29–30, 68–69). Apart from that, the accounts of the plea negotiations given by Schroeder and his counsel sharply conflict. Schroeder's counsel testified that he told Schroeder that rejecting the eight-year offer was "damn foolish" because Schroeder was facing a minimum of 25 years in prison if convicted (Dkt. 25-4 at pp. 29–34). Schroeder testified that his counsel "never advised [him] to take a plea or that [he] should take a plea" (Dkt. 25-4 at p. 68).

The Court will deny relief on this ground. The state trial court's implied finding that Schroeder rejected the eight-year plea offer against his counsel's advice is presumed to be correct. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (holding that a state court's factual findings are presumed to be correct, whether those findings are express or implicit). Schroeder has not rebutted that presumption of correctness. If Schroeder rejected the offer against his counsel's advice, then he obviously cannot obtain habeas relief on the basis that his counsel gave ineffective advice. As the "master of his own defense," *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999), a defendant who "blocks his attorney's efforts to defend him . . . cannot later claim ineffective assistance

of counsel." *Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (quotation marks and citation omitted).

### C.    The motion for new trial

Schroeder also mentions that, after the verdict, his counsel "essentially vanished[,]" refusing to answer letters or phone calls, and that Schroeder essentially had to take over his own defense until his trial counsel withdrew and another lawyer was appointed to represent him (Dkt. 1-1 at p. 7; Dkt. 35 at p. 5). In the meantime, Schroeder missed his deadline to file a motion for new trial. The Court will deny relief on this ground because Schroeder cannot show prejudice. The Fourteenth Court of Appeals extended Schroeder's deadline to file a motion for new trial and remanded the case to the trial court so that Schroeder and his new counsel could request a hearing and develop a record in support of Schroeder's claim of ineffective assistance of trial counsel. *See* Fourteenth Court of Appeals of Texas, Cause Number 14-12-00523-CR, Order of Abatement dated Oct. 25, 2012. The Fourteenth Court then considered that record and wrote a thoughtful opinion addressing all of Schroeder's arguments. Schroeder has not pointed out any arguments or points of error that were waived or inadequately preserved on account of his counsel's post-verdict actions.

The state courts' adjudication of Schroeder's claims of ineffective assistance of counsel did not result in a decision that was contrary to, or involved an unreasonable application of, *Strickland*. The Court will deny relief and dismiss Schroeder's habeas petition.

## V.    CERTIFICATE OF APPEALABILITY

The federal habeas corpus petition filed in this case is governed by the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), codified as amended at 28 U.S.C. § 2253.  Therefore, a certificate of appealability is required before an appeal may proceed.  *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see also Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

A district court may deny a certificate of appealability, *sua sponte*, without requiring further briefing or argument. *Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find its assessment of the claims debatable or wrong. Because the petitioner does not otherwise allege facts showing that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.

## IV.    CONCLUSION

Based on the foregoing, the Court **ORDERS** as follows:

1.    The Respondent's motion for an extension of time and motion for summary judgment (Dkt. 23 and Dkt. 26) are **GRANTED**.

2.    The habeas corpus petition (Dkt. 1) is **DISMISSED WITH PREJUDICE.**

3.    A certificate of appealability is **DENIED**.

The Clerk shall provide a copy of this order to the parties.

SIGNED at Galveston, Texas, this 15th day of September, 2016.

George C. Hanks Jr.
United States District Judge